(C.D. 4817)

WESTINGHOUSE TRADING COMPANY, PLAINTIFF *v.*
UNITED STATES, DEFENDANT

■■■■■■■■■

Court No. 77-9-03272

■■■■■■■■■ (Decided August 7, 1979)

*Barnes, Richardson & Colburn (James S. O'Kelly* at the trial; *Richard Haroian* with him on the briefs) for the plaintiff.

*Stuart E. Schiffer,* Acting Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, Field Office for Customs Litigation *(Susan C. Cassell* at the trial and on the brief), for the defendant.

BOE, Judge: The imported merchandise in issue, consisting of translucent alumina tubes, commonly referred to as PCA tubes, was imported from Japan and entered at the port of New York between August 1976 and December 1976. The merchandise was classified under item 536.15, TSUS, providing:

*Schedule 5, part 2, subpart E:*

> Ceramic wares, and articles of such wares, not specially provided for:
>
> \* \* \* \* \* \* \*

536.15 Other _____ 20% ad val.

In the trial of the instant proceeding, however, the Government concedes that the subject merchandise was improperly classified under item 536.15, TSUS, and presently claims that the same is properly classifiable under item 536.11, TSUS, providing:

*Schedule 5, part 2, subpart E:*

> Ceramic wares, and articles of such wares, not specially provided for:

536.11 Of porcelain or of subporcelain _____ 22.5% ad val.

The plaintiff claims that the merchandise in question should be classified under item 535.14, TSUS, providing:

*Schedule 5, part 2, subpart D:*

> Ceramic magnets, ceramic electrical insulators whether or not in part of metal, and other ceramic electrical ware, including ferroelectric and piezoelectric ceramic elements:
>
> \* \* \* \* \* \* \*

535.14 Other _____ 15% ad val.

From the evidence adduced it is undisputed that the translucent tubing is manufactured in accordance with the specifications prepared by the plaintiff for use exclusively in the United States in the manufacture of electrical sodium discharge lamps.[1] The tubing is manufactured from a polycrystalline alumina material, the chemical constituency of which is the oxide of aluminum. The plaintiff's specifications require a purity standard of 99.7 percent and a melting point of 2040°C in order to insure the tube to be able to withstand an internal temperature of 1200° to 1300°C during the course of its operation.

Except for cleansing from accumulated dust or dirt, the PCA tubing upon importation is ready for use and assembly. The assembly process is initiated by affixing at each end of the tube a niobium formed cap with "tubular portions" extending therefrom and tungsten electrodes extending within. A vitreous material is filled between the cap and the tube, which when heated in a vacuum furnace to a temperature of about 1300°C seals the cap on either end of the

---

[1] The record consists of the testimony of one witness, Vernon L. Plagge, a ceramics engineer employed by the plaintiff since 1941, and 8 exhibits introduced by the plaintiff. The defendant rested its case without the introduction of any evidence.

PCA tube. In a simultaneous process the open end of the niobium tube is filled with sodium amalgam, consisting of sodium and mercury, while air is removed from the tube and replaced with xenon gas. The PCA tube is thereupon sealed and mounted on a structure for encapsulation and sealing within an outer bulb. Because of the high degree of temperature at which the PCA tube operates, it is necessary to exhaust all air from the outer bulb thereby providing a vacuum to protect the metal caps affixed at the end of each enclosed PCA tube from oxidation. By connecting an electric current to the lamp as fully assembled, electrons pass in the form of an arc through the sodium and mercury vapor amalgam contained in the PCA tube causing a light to be produced and emitted therefrom.

In addition to conceding that the classification of the imported merchandise in issue under item 536.15, TSUS, is incorrect, the Government in its answer admits that the imported PCA tubes are used exclusively to make electric discharge lamps and that the same are used exclusively in electric articles or devices.[2]

In view of the defendant's concession that the official classification under item 536.15, TSUS, was erroneous, the plaintiff has been relieved of the initial onus of its dual burden of proof. See e.g., *United States* v. *New York Merchandising Co.*, 58 CCPA 53, C.A.D. 1004, 435 F. 2d 1315 (1970). There is no dispute that the merchandise involved in this case is ceramic articles. Compare *Sprague Electric Co. et al.* v. *United States (Montgomery Ward & Co., Party-in-Interest)* 64 Cust. Ct. 135, 144–46, C.D. 3972 (1970). Thus, the sole remaining issue in this action is whether the plaintiff has demonstrated that the merchandise is appropriately described by item 535.14, TSUS, as "* * * ceramic electrical insulators * * * (or) other ceramic electrical ware." If answered affirmatively, the plaintiff must prevail since item 535.14 is more specifically descriptive than the defendant's claimed alternative item, 536.11, TSUS, which is, in effect, a "basket" provision for certain ceramic articles not specifically provided for. See "Tariff Classification Study, Explanatory and Background Materials," schedule 5, at 96 (1960).

The plaintiff's witness, Plagge, testified unequivocally that the imported PCA tubes are ceramic electrical insulators because they serve to resist the flow of electricity in their use in the sodium discharge lamp. The defendant does not dispute the fact that the PCA tubes serve as electrical insulators. Rather, the defendant maintains that the tubes are "more than" or "other than" electrical insulators in a tariff sense because they serve various essential functions in the sodium lamps in addition to electrical insulation.

It is unnecessary for this court to determine whether the imported PCA tubes are "more than" or "other than" ceramic electrical in-

---

[2] Pars. 9 and 11 of defendant's answer.

sulators. Assuming arguendo the validity of this contention, they, nevertheless, fall squarely within the provision for "other ceramic electrical ware" in item 535.14, TSUS. As was stated by our appellate court in *United States* v. *Mitsubishi International Corp.*, 60 CCPA 79, 82, C.A.D. 1085, 470 F. 2d 1387 (1973):

> [I]t is our opinion that a ceramic insulator is not a separate class but a species of the broader class of ceramic electrical ware. * * *

It is undisputed that the PCA tubes perform a number of essential functions in an electrical article, that is, the high-pressure sodium lamp. A tube is required to possess extreme heat-resisting qualities, to serve as an insulator against the electronic impulses applied at either end of the tube, resist the corrosion resulting from the sodium vapor and be sufficiently translucent to permit the emission of light. The testimony of plaintiff's witness, Plagge, was uncontradicted that the extensive production of high-pressure sodium lamps was not economically feasible until the invention of the PCA tube in the early 1960's. Again it is pointed out, the defendant has admitted that the imported PCA tubes are designed for and solely and exclusively used in the production of the electric discharge lamps. These factors provide ample and convincing evidence that they are properly described as ceramic electrical ware. See *United States* v. *Mitsubishi International Corp., supra.*

Nevertheless, the defendant contends that, as imported, the PCA tubes have no electrical component, and are therefore not ceramic electrical ware. According to the defendant, only after further processing in this country—the assembly of the electrode structure, the capping of the ends to form a closed tube, the encapsulation of gas within the tube, and heat treatment to fuse the caps or ends—do the articles possess an electrical component, and thus become electrical ware.

The defendant's contention must be rejected. Though no all-encompassing definition for the term "ceramic electrical ware" need be attempted, such definition surely includes articles such as the imported PCA tubes which are designed and exclusively used for the production of an electrical device. The fact that the articles have no electronic component at the time of importation is not dispositive. As the U.S. Tariff Commission stated in its "Tariff Classification Study," schedule 5, at 95:

> Item 535.14 does not embrace switches, fuses, receptacles, lamp sockets, resistors *and other electrical articles which are to be connected into electrical circuitry.* (These are specifically provided for in part 5 of schedule 6.) * * * [Italic added.]

Those articles which are advanced to the point of being capable of connection into electrical circuitry are classifiable, not as electrical ware, but as discrete electrical articles. Thus, once the processing about which defendant is concerned takes place, it appears the resulting article would no longer be classifiable as "ceramic electrical ware" under item 535.14, but as an electrical article per se in part 5 of schedule 6.[3] Cf. *United States* v. *Mitsubishi International Corp., supra,* at 84.

Further support for this interpretation also can be found from the facts in the *Mitsubishi* case, *supra.* The merchandise involved in that action consisted of ceramic "housings" which served as exterior covering and insulation for lightning arresters. From the trial court's description of the merchandise, with which our appellate court did not disagree, it appears that, as imported, the housings possessed no electrical component, and were solely composed of a one-piece, circular ceramic construction. See *Mitsubishi International Corp.* v. *United States,* 66 Cust. Ct. 413, 415–16, C.D. 4227 (1971), *rev'd,* 60 CCPA 79, C.A.D. 1085, 470 F. 2d 1387 (1973). This absence of an electrical component at the time of importation did not prevent the appellate court from holding the "housings" to have been properly classified as "other ceramic electrical ware" under item 535.14. *See* 60 CCPA at 83.

As a caveat to the foregoing, the decision herein should not be viewed as holding any ceramic article which could conceivably be used in an electrical device is, therefore, ceramic electrical ware within the intendment of the TSUS. Each case necessarily must be determined upon its own facts and the nature of the merchandise in issue. However, as in this case, where the record convincingly demonstrates that an imported ceramic article is designed and used solely as an essential component part of an electrical device, then that ceramic article is properly classifiable as ceramic electrical ware under item 535.14.

The claim of the plaintiff is sustained.

Let judgment be entered accordingly.